**In re LES FEMMES MAGNIFIQUE, INC., Debtor.**

**HILTON HAWAIIAN VILLAGE JOINT VENTURE, Plaintiff,**

v.

**LES FEMMES MAGNIFIQUE, INC., Defendant.**

No. 82–0118.

United States Bankruptcy Court, D. Hawaii.

Sept. 23, 1982.

---

J. Stephens Street, Susan Tius, Honolulu, Hawaii, for plaintiff.

Edward C. Kemper, Honolulu, Hawaii, for debtor-defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JON J. CHINEN, Bankruptcy Judge.

On June 22, 1982, Plaintiff Hilton Hawaiian Village Joint Venture (hereafter "Hilton") filed a Complaint to Vacate Stay and for Order Directing Turnover of Possession of Premises and for Administrative Rents. At the hearing on Debtor's Motion to Dismiss for Failure to State a Claim on August 6, 1982, it was agreed between the parties that the instant action should proceed solely on the issue of whether Plaintiff is entitled to a vacation of the automatic stay imposed under § 362(a) of the Bankruptcy Code.

Hearings in regard to Hilton's complaint were held on August 16 and 18, 1982. J. Stephen Street and Susan Tius represented Hilton and Edward C. Kemper represented Les Femmes Magnifique, Inc. (hereafter "Debtor"). Based upon the evidence adduced, the record of this action and in Adversary No. 82–0077, and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Debtor entered into an Agreement with Hilton dated January 8, 1981, under which Debtor was to use the Long House of the Hilton Hawaiian Village to present a certain specified cabaret show. The term of the Agreement is for two (2) years, commencing on February 1, 1982 and ending January 31, 1983. Effective August 21, 1981, Hilton and Debtor entered into an Addendum amending the January 8, 1981 Agreement.

2. The terms of the Agreement, as amended, include *inter alia,* the following provisions:

(a) Debtor "will produce and present a show in the LONG HOUSE patterned after the 'Crazy Horse' show of Paris and substantially as depicted on those certain video tapes given to HILTON."

(b) "[T]he content of the show shall at all times be subject to the approval of HILTON and its approval or disapproval shall be within its sole discretion. . . ."

(c) On a monthly basis the Debtor shall pay Plaintiff lease rent of $3,138.00, pay the cost of any operating losses for beverage services plus a guaranteed minimum monthly beverage profit of $4,000.00, and reimburse Plaintiff for all its utility charges, which cost between $900.00 and $1,400.00 per month.

(d) A party shall be deemed to be in default where "he has received notice of the alleged default and has failed to rectify notice of the alleged default within fifteen (15) days of receipt of said notice, except, however, that any continued production following a disapproval by HILTON of the Show content, costuming, or staging, as provided in paragraph 1, supra, shall constitute an immediate default and HILTON shall have the right to terminate this agreement without further notice."

(e) Debtor "shall be responsible at its sole expense to provide all property, sets, lights, lighting and sound systems and equipment, costumes, props and all other physical aspects, effects and accoutrements used in and for the production, and upon termination of this agreement, if COMPANY is not then in default, may remove all such property and equipment and upon HILTON's request shall restore the premises to the condition that existed prior to commencement of this agreement. If COMPANY's property is not removed within fifteen (15) days after the termination of this agreement, it shall become the property of HILTON."

3. After a series of discussions between September, 1981 and January, 1982 concerning the Les Femmes show and after Debtor's failure to make payments according to the Agreements, Hilton gave written notice, by letter of April 14, 1982, of Debtor's breach of its Agreement with Hilton. By letter of April 19, 1982, Debtor was advised that, if it did not make payment of amounts then due and owing, the Agreement would be terminated and the last show would be performed on April 30, 1982.

4. As of March 31, 1982, Debtor was in default of its Agreement with Hilton for failure to pay rents, utility charges, beverage costs and minimum beverage profits during February and March in the amount of $36,904.55. The Debtor's schedule of liabilities allows Hilton's pre-bankruptcy claim as of April 30, 1982 in the amount of "$45,000.00 approx."

5. Debtor filed its petition for relief under Chapter 11 on April 30, 1982 but did not inform Hilton until May 1, 1982. At that time Hilton took the position that it was not bound to continue to provide, without payment, the services specified in its January 8, 1981 Agreement, as amended, such as host services, ticket collection, waiters, waitresses, and bartenders, nor was it bound to continue to provide liquor and other beverages beyond the noticed termination of its Agreement with Debtor.

6. At hearings on May 4, 11, and 13, 1982, this Court provided for continued performances of the Les Femmes show with required payments by Debtor to Hilton for its out-of-pocket expenses for labor and beverages, but not for electricity, administrative expenses necessary for the production of the show, rents and minimum beverage profits. The Court required on May 13, 1982 that these out-of-pocket expenses payment be made daily to Hilton.

7. The Les Femmes show continued to be performed until May 21, 1982 when it was voluntarily suspended by Debtor. And thereafter, no show has been performed in the Hilton Long House, and Hilton has been unable to use the Long House for other purposes because of the pendency of this action.

8. Mr. Suresh Jhaveri, President of Les Femmes, testified that post-bankruptcy the show was turned over to an individual named Mr. Bernard Drisang, whom Mr. Jhaveri did not supervise directly, and who was supposed to make up any operating losses sustained by the show from his own assets. Mr. Jhaveri testified that Mr. Drisang left Hawaii without paying the performers.

9. Since bankruptcy was filed, no rent has been paid by Debtor to Hilton for the months of May or June, 1982. Rents were

paid for July and August, 1982 pursuant to court order. Mr. Jhaveri testified that the source of these rental payments was India Imports International, Inc. No minimum beverage profit payments ($4,000.00 per month) have been made for any month post-bankruptcy.

10. Hilton's manager, Mr. Bruce Ulrich, testified that Hilton is harmed not just by financial losses due to continued occupation by Les Femmes of the Hilton Long House. He testified that the injury to Hilton goes also to Hilton's good will in being unable to fully serve its guests. He testified that the dark and idle Long House could be expected to damage Hilton's image as an alive and vital hotel and that the current uncertainty as to its use damages Hilton's business reputation.

11. Mr. Ulrich testified that the Long House could be alternatively utilized for banquets generating gross revenues of $15,-000.00 to $20,000.00 per month, twenty percent of which would be profit to Hilton. Additionally, Mr. Ulrich testified that the Long House could also be utilized for meetings and exhibits, generating additional revenues with minimal overhead expenses. Mr. Ulrich also testified that consideration had been given to the Long House as a site for an electronic gameroom or for retail shop space.

12. The Les Femmes show has not been profitable as conceded in Mr. Jhaveri's testimony and as evidenced by Debtor's $778,-353.88 in debts to India Imports International, Inc., another company of which Mr. Jhaveri is president and from which Mr. Jhaveri authorized repeated substantial loans to meet operating losses.

13. Mr. Jhaveri testified that he had recently contacted others concerning putting different shows on in the Long House. Among the shows he proposed putting on as the means of reorganizing were a) Les Femmes show, as modified by choreographer, Mr. Jeffrey Kutash (Les Cabaret), which show had been performed from mid-April, 1982 until May 21, 1982; b) a show also choreographed by Mr. Kutash, known as the Dancin' Machine; or c) a show called Lullaby of Swing.

14. The Debtor offered into evidence a letter from Mr. Kutash indicating an interest in performing a two week engagement of his show, the Dancin' Machine, in the Hilton Long House; however the letter did not outline terms and conditions of any performance.

15. Debtor also presented Messrs. Spurr and Sullivan who have produced a show called Lullaby of Swing in Hawaii for the past ten (10) months and who expressed an interest in performing their show in the Long House. They also indicated a willingness to produce any one of a number of other shows, including the Dancin' Machine.

16. The terms of all plans outlined by Mr. Jhaveri rely entirely on ticket sales to pay current operating expenses, with any profits thereafter used to pay pre-bankruptcy and unpaid post-bankruptcy expenses. However, profits for the Les Femmes show historically has been non-existent.

17. The terms of the Hilton-Les Femmes Agreement, as amended, require payment by Debtor to Hilton of $4.19 per ticket sold for Hilton to provide two (2) standard beverages and the host, bartender, and other services to provide such beverages. Additionally, a minimum beverage profit was agreed upon to assure payment of Hilton's out-of-pocket service associated with the show, irrespective of attendance of the show. Out-of-pocket beverage service costs to Hilton associated with Les Femmes show averaged in excess of $500.00 per night. Thus, in order for Debtor to perform a show, it must be prepared to pay Hilton's operating losses for the services provided, plus a minimum profit of $4,000.00 per month.

18. Neither Mr. Spurr nor Mr. Sullivan had seen a copy of the January 8, 1981 Agreement or the August 21, 1981 Addendum. The Budget submitted by Mr. Spurr and Mr. Sullivan for the production of a show in the Long House did not include any payment for utilities which had cost Les Femmes between $900.00 and $1,400.00 per month. Nor did the Budget include any

minimum beverage profit as provided in Hilton's Agreement with Debtor. Mr. Sullivan also acknowledged that the Budget understated expenses by making no provision for expenses of workers compensation costs, and employer's contributions to social security.

19. Mr. Sullivan testified that the Lullaby of Swing show had averaged 80 to 100 guests per night at its last show place. He acknowledged that a new show in the Hilton Long House would lose $1,000 per week if it attracted only 100 persons per night under the Budget submitted as Exhibit D-3, even without consideration of utility costs and other expenses omitted from that Budget.

20. Attendance figures for the Les Femmes show introduced as P-1 demonstrate the difficulty in securing sufficient attendance for a new show to be profitable to even to pay show expenses.

21. Mr. Sullivan testified that his group would set up a new corporation to perform this show and that his group would not personally guarantee any payment of rents or other costs to Hilton of services associated with production of a new show.

22. The Lullaby of Swing show left its first showroom, the Oceania, in a financial dispute with its landlord and without advising anyone, allegedly to avoid attachment of equipment. A lawsuit has been filed by Lullaby of Swing's Oceania landlord, alleging over $125,000.00 in unpaid rents, advertising fees, and maintenance fees associated with the performance of Lullaby of Swing.

23. Debtor's representatives testified that the original expenditures to convert the Hilton Long House into a showroom were between $200,000 to $400,000.00. No evidence was presented by Hilton or Debtor concerning any salvage value of the fixtures, equipment or personal property within the Long House.

24. Mr. Ulrich representing Hilton testified that for Hilton to remove fixtures and restore the Long House to its former condition would cost Hilton between $75,000.00 and $100,000.

25. As part of the August 21, 1981 Addendum to the Hilton-Les Femmes Agreement, provision was made for a $20,000.00 deposit against Hilton's supplying liquor and other beverages and services. Hilton and Les Femmes agreed:

That Hilton retain the $20,000 deposit provided pursuant to Paragraph 4 of the August 21, 1981 Addendum throughout the continued performance of the Les Femmes show. Such deposit or any part of its may be applied at any time by Hilton, at its option, to any unpaid balances or other liabilities of Les Femmes Magnifique, Inc.

26. Debtor claims that the Long House badly leaked and caused damages to the interior of the building. It also alleged that Hilton illegally closed the premises after the petition had been filed and that Hilton "defamed" Debtor and its show.

## CONCLUSIONS OF LAW

1. Hilton's request for relief from the automatic stay is governed by 11 U.S.C. § 362(d), which states:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under sub-section (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for such cause including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Hilton alleges two alternative grounds for relief from the automatic stay: (1) lack of adequate protection of their interest in the property, and, alternatively; (2) that the Debtor does not have any equity in the property and the property is not necessary to an effective reorganization.

## RELIEF UNDER SECTION 362(d)(2)

2. Under Section 362(d)(2), the Court must find that Hilton has no equity in the property in question and that the property is not necessary to an effective reorganization prior to lifting the automatic stay. And under Section 362(g)(1) Hilton has the burden of demonstrating that Les Femmes has no equity in the property.

3. Hilton did not present any evidence as to the value of the Agreement. On the other hand, Les Femmes presented two groups who showed interest in utilizing the Long House. Both groups felt that the Long House was ideally situated to present a show and that they only wanted assurance that the Long House was available before committing themselves. In addition, Hilton did not present any evidence concerning the value of the furniture, equipment, and other personal property in the Long House.

4. The Court finds that Hilton has failed to prove that there is no equity in the property. Thus, Hilton is not entitled to relief under Section 362(d)(2).

## RELIEF UNDER SECTION 362(d)(1)

5. Under the Agreement, as amended, Debtor is required to pay to Hilton a monthly rent of $3,138.00, cost of any operating losses for beverage services plus a guaranteed minimum monthly beverage profit of $4000.00 and to reimburse Hilton all utility charges.

6. Debtor schedules of liabilities show a prepetition debt owing to Hilton as of April 30, 1982 in the approximate sum of $45,000.00. And, since the filing of the petition, Debtor has not paid any rent for May or June, and it has not made any of the minimum beverage profit payment of $4,000.00 per month.

7. Hilton contends that, if it regains possession of the Long House, it may be able to use the premises for banquets, for meetings and exhibits. Hilton contends that the Long House could also be used for an electronic gameroom or for retail shop space.

8. As offsets to the foregoing claims of Hilton, Debtor claims that it has a deposit of $20,000.00 with Hilton and that it has claims for damages against Hilton because of the leaks in the Long House, by virtue of being locked out of the premises for a while and because Hilton had defamed Debtor and the show.

9. Debtor further contends that, because of this dispute concerning the amount of liabilities, until the matter is resolved, Debtor should be permitted to remain on the premises to generate income to pay its creditors.

10. The Court finds that, under the Agreement as amended, Hilton is entitled to a monthly rent of $3,138.00 guaranteed beverage profit of $4,000.00, plus expenses. The beverage profit has not been paid since the filing of the petition. If the Long House is returned to Hilton, Hilton has various plans to generate income. By retaining possession of the premises, Debtor is denying Hilton an opportunity to generate that income. To adequately protect Hilton, Debtor must pay to Hilton post-petition amounts as provided for in the Agreement.

11. The Court will continue the stay on condition that Debtor pay to Hilton within 7 days from the date hereof all post-petition rents, the $4,000.00 a month guaranteed beverage profit and all expenses incurred by Hilton in connection with the shows. Thereafter, Debtor must make all payments as provided for in the Agreement. Otherwise, on the filing of an Affidavit to show non-compliance by Debtor, the Court without a hearing will issue an order lifting the stay.